We'll hear is United States v. Shephard, and Ms. Okawa, we'll hear from you. Okawara, I think I didn't pronounce it correctly. Chiege, hello, Okawara for Ms. Shephard. Ms. Shephard is asking this court to remand her case back to the district court for re-sentencing without the two-level enhancement for the loss amount from 18 down to 16, as well as the two-level vulnerable victim enhancement. With regards to the vulnerable victim enhancement, the court, without going through the two-prong analysis, just found, based on its history in the case, that the victims were vulnerable. As appears in the joint appendix, the lead sheets are attached where they call these victims. All they do is a by-list, and they call them. Somebody may respond, and some people say, don't call me back. Some of the lead sheets appear on the page. What about the ones that they continue to pursue? What do they call that process? They call them reloaded, but they don't... Reloading, the ones they reloaded several times and brought, got more money in, and as a matter of fact, some of these people ended up losing their homes, and they lost... That is true, but initially, the initial contact you have to show is, did they call them because they're vulnerable, and then they're not? They just call, and some people respond, and people could respond, not because they're vulnerable. It could be the second time when they do it and give up money, and then the third time, they go as long as the victim's willing to do it, and doesn't that indicate some vulnerability? I don't think, Your Honor, it does indicate solely vulnerability. It could indicate a lot of things. I want to make more money. I want to make more money. They're not calling them. The grand jury indictment specifically stated on Appendix JA-13 that they're targeting people who are 55 years or older. None of that is accurate, because if you look at the list, it just has names. It has addresses. It has phone numbers. The District Court, I thought, relied on the fact that there were victims who were subject to the process of reloading, and that was indicative of vulnerability, because they were gullible enough to give up money again and again, even to the point where they're taking out a second mortgage or they're borrowing the money. Those facts, don't they suggest some vulnerability? The District Court actually did not go through the two-prong analysis. The District Court just said, based on my history of the case and how these things work, I found that the victims are vulnerable. The government, in its brief, indicates that my client was an opener, a loader, and a runner. It was only after we filed the objections to the Vulnerable Victim Enhancement that the government then says that she's a reloader. But their whole history, even on the brief on pages 4, 5, and I believe on 6, they continue to say she's a loader. But the court did not make the two-prong analysis before finding that the victims were vulnerable. Nobody testified in court, and the court based it on the history of other cases. And I think because of the... When this determination has been made in other cases, what additional things do you maintain have been solicited to establish this enhancement? But it hasn't been made in all cases. I know this court in Bowdoin did not find that the victims were vulnerable. Well, in the cases in which it has been found, what additional information was solicited or found? I think in some of the cases, the victims actually came and testified, or they brought one or two to testify and say, we invested with this person because of our age, or I think our manager, they actually said we actually talked to him about wanting to save money, age, and all that. Nothing was done in this case. And part of my objections in the district court level was they attached victim lists or restitution worksheets in other cases and said that so they continue to go this. But nothing was presented before the district court to say, this actual person was vulnerable in this case, and you should find the enhancement. None of that was done in this case. Are the letters from the victims matters that the court could have considered? The letters were mostly shown as far as the restitution amount and how much they had lost yet. But are those letters a free game for determining vulnerability? They are, but I think it still doesn't change my argument. Those letters are pretty pitiful, aren't they? Oh, absolutely, and what happened in this case is terrible, but as far as... Well, I'm talking about with respect to the impact on the victims and their vulnerability and their gullibility and giving up money they don't even know who they're dealing with and doing it a second time, third time, and losing their jobs and their houses and everything. It's a, as you say, it's really a hardship situation. It is a hardship, but we're looking after the fact. We have to look at how did they become victims in the first place and it was buying a code list with people's names and numbers and if the court looks at some of them had been disconnected, some of them that they couldn't reach. The second issue that I want to address is the loss amount. We objected to the loss amount. My client was indicted for offenses that occurred from 2007 to 2012. The offense date has from 2007 ends in November 2012. There's a loss amount determined by the government. But the conspiracy doesn't end. We say in her case that it ended. The indictment, the notice in the indictment said the offense date, the acts were up until November 2012. My client indicated that high involvement stopped in December 2012. The indictment was returned January... Have you added up the numbers when you take off the years you claim should come off? I do and if I will point the court... I thought it still exceeded 3.5 million. I'm sorry? It still exceeded 3.5 million. We say it doesn't. If you look at the government attaches from page 99 or 98, it indicates that they're calculating the loss through February 2015. If you look at from page 99 of the loss analysis through page 146, the loss amounts they include are from 2010 to 2012. So they don't even have any basis to support including... Why are you limiting those times? The charge conduct was much larger. The charge conduct is from 2007 to 2012. Yeah, that's five years. The government's position is, well, we don't have any monies approved from 2007 to 2010. Well, we appreciate that but they have to prove the loss amount. They haven't proved it. I understand that. But what is your argument that she was in jail but never withdrew from the conspiracy? We said she withdrew from the conspiracy. The government has... Where's that? That's our argument and the government had no proof before... I just got to present evidence. Just a minute. You say that's an argument. What's it based on? What is based on her statement and the government's evidence? The government has no evidence of mischief... Can you just not move on? Stick with my questions. You say she withdrew from the conspiracy. What is the evidence that she withdrew from the conspiracy? She didn't participate. She went on a legitimate job. The government has no evidence of mischief. I want to know what you're basing on the fact that she withdrew. Based on her statement, her proffer to the government. What's her statement? Her statement is in the joint appendix. I worked from 2007 to 2012 and I didn't do that anymore. It's in the joint appendix. It's in her acceptance of responsibility statement. She maintained throughout. That's because she was arrested, right? No, she wasn't arrested until about 2015 in Costa Rica. She wasn't arrested until 2015. The government even says, we give Ms. Sheppard credit for her saying her involvement ended in 2012. There's no evidence before the court that she did anything. I looked at some of the cases this court has decided... So you're saying that she withdrew from the conspiracy when she stopped making calls? When she stopped being involved, stopped working at the call center, stopped making any money, started doing a teaching job as an English professor... Okay, what date was that? December 2012. Okay, now from 2010 to December 12, what is the total amount of loss shown on those two? We're saying it's under $3.5 million. And we say that because as I had cited to the district court... No, no, I'm asking you just stick with my question. You're jumping ahead. Okay, sorry. I want to know what that chart, the government chart shows from the period of the beginning as early as they have up to December 2012. Total amount, total amount. Total amount is under $3.5 million and we go with... Is what? Under $3.5 million based... What is the number? Do you know? Let me put it, it's on... It's on joint appendix page 98. 98? Well, don't waste your time then. I don't want to take all your time. Stick with what you want to... It's on page 98 and what I was trying to tell them... What's the number? Joint appendix page 98. I know, but what's the number? Based on what they have for the call center for Jeffrey Bonnett, Cody Bucksteiner, you have 2473668.71. Then under Ms. Shepard, they have January 2010 to 2015. So, it's not broken down. My other concern, Your Honor, even though they indicate that the lost amount goes through 2015, if the court takes the time to look at pages 99 through 146, the receipts and payments are from 2010 to 2012. There's no receipt of any payments in this sheet from 99 to 146 that includes any amounts from 2013, 2014, 2015. So, their calculation is incorrect. There's no proof to support any amounts having been received after 2012. What is the total amount they show, then? They show 7.2 million, right? They show 7.2 million, but that's through 2015. They don't show from Ms. Shepard, 110... Why Ms. Shepard? It's everybody. She's responsible for the whole conspiracy. We said she withdrew in 2012 and she didn't be responsible for anything after 2012. If you'll listen to my question, we may get a useful answer, but my question is the whole conspiracy up to December of 2012, what did the government show? It depends on each case. I argued in the Bonner case... No, no, it doesn't depend on each case. It's what did they show in this case. Well, in this case, they have different amounts for different people. They have a different amount... I'm saying for all the people. They broke it down. They have 2.4, they have 7.3... You don't know the answer? I'm sorry? You don't know the answer? Well, that's why I'm saying they don't know their calculation because their calculations are incorrect. We say it's less than $3.5 million based on the court's finding that the Bonner call center made less than $3 million when it sentenced Mr. Atkins in the Companion case. I guess I didn't fully follow, but you have some time to come back. Yes. And I'll see if I can get some clarification from the government. You can respond to that then. Yes, thank you. All right, Ms. Bonner. Good morning, Your Honors. Joanna... Could you just address my question of what was the conspiracy loss amount attributed to conspiracy from beginning until December 2012, if you know? It's about approximately... For the Western Union, it's about $5 million. There's only about $223,000 in loss after... from January 2013 after through... So, what's the number? Why do you use just Western Union? She said she admitted the other service, too. Yes, the MoneyGram wire transfers only go through July 2012. And so, there's a total of... Okay, what's the total amount of loss up to December 2012? It's close to $7 million. That's what I thought. I mean, I thought it was lower, actually, but it's... Just slightly. I mean, I believe there's only about $223,000. You take her date of withdrawal in December 2012. Yes. You're saying the numbers, the total loss attributed to the conspiracy is still in the $7 million range? Yes, it's still well within the 18-point level enhancement. 18-point begins at $3.5 million? Yes. All right, then go ahead. Where is that in the record? Because the opponents seem to have a problem finding that. I don't know where it is. So, if you look at the spreadsheet that was provided to the court, and I will note that when I was going through the joint appendix preparing for argument, I realized that some of the loss calculations were inadvertently omitted from the joint appendix. However, there's no indication that this information was omitted. In the district court, the government provided the sentencing, the complete financial analysis. Is the record before us, does it reflect the $7 million you're talking about? There are about 80 pages missing in the Generation II Western Union financial analysis. So, I want you to answer my question. Does the record before this court contain the establishment of the fact that $7 million was missing during that time period? The financial analysis, that was inadvertently omitted. Well, the answer can be yes or no, and then you can explain, but he's asking whether the joint appendix as we have it now, does it show $7 million for that period? No, as it currently exists. However, the court did rely... What does it show? It shows approximately, I believe approximately $3.4 million. However, the... Does the record contain all the evidence? The record in the district court?  So, you're saying it's an omission of portions of the record that are not included in the JA? Yes, yes. Have you supplemented the JA for that purpose? No, but the government would be happy to do so if the court so wishes. Yeah, so don't you think it's sort of important since that's your argument? Yes, Your Honor. I would have thought you would have done that as soon as she starts alleging that the amounts are not there, and you're saying the amounts are there and it's in the record, but you didn't provide it to the JA. Well, she never raises this issue in her brief, and it wasn't something that was discovered very recently, Your Honor. But it came up as a result of questioning as to whether it made a difference if we agreed with her argument that, okay, you know, but in terms of the amount that even during that time period was going to exceed 3.5. And the question is, does the record flat that? And you say, well, it was down in the district court. That's not very helpful for something being in the district court. We, you know, as much as it's nice to say, well, it was there, until it's a part of this record, it just is not so here. Well, I would argue that Ms. Shepard is not contesting that that analysis is not included in the record that her two main arguments are that she withdrew. The record is what was before the district court. Let's get clear what we're talking about. And what Judge Wynn is saying, we don't have that portion of the record to address the issues raised on appeal, one of which is the $3.5 million amount was not established. You're saying it was established and it's in the record, but we just don't have it. We're missing eight pages. Is that right? Yes, Your Honor. Well, now, shouldn't you be supplementing that? Did you file a supplemental appendix? No, but I will be happy to do that  I would think if this is a contested issue that we have to address. So long as you rely on the record. You can only give us a joint appendix of what's in the record. And see, I want you to make me clear on it. Some of us approach this differently. I spent a lot of time as an appellate judge. What's before me on a record of appeal, unlike maybe those who think that the record below is the record to look at, we don't look at something we think or you represent is the record. It's the record on appeal that matters. And if you want what's down there, have it sent to us. That cures it. I think it's the same thing, but to represent the record said is your representation. That's not the record. The record on appeal is what we have. And I don't like deciding stuff based on, well, the record that the trial said this and we believe it says this. The easiest thing to do is make it part of the record on appeal. Yes, Your Honor, and I will do that as soon as I return. There was a summary sheet provided to the court at sentencing and as well as to probation and to defense counsel, and it showed that there were $7.2 million in losses. Where is that? Let's see. Apologize, I don't have the... Is that the third appendix? It is in the joint appendix. Yes, it should be right after the sentencing transcript. It's the first page of the financial analysis. So the court was permitted to rely upon the government. Is that at 979? Is that the one? You don't have that here? I have it right here, Your Honor. That list at 979 shows $9.7 million. So is it page 98 of the record? What? Joint appendix 98. That's what Mr. Quarra showed us earlier. Yes, and that's showing the Western Union and the MoneyGram. And what is that? Does that show the $7.2? Yes, it does. Well, then it is in the joint appendix. Yes, it is, but the complete financial analysis, that's what I was inferring. So I wanted to explain that the summary sheet was, in fact, part of the record. The government explained how the analysis was, how the government agents came up with the financial analysis and came up with the financial 7.2 loss. It was based on a two-part generation one and generation two Western financial analysis solely on Western Union and MoneyGram. Is that 7.2 for the time period that the defendant maintains she was part of this conspiracy or was it for the period in which the conspiracy existed? So this is from 2010 through 2015. The entire conspiracy went through 2007. The factual basis goes through 2012. The indictment goes through 2012. I'm sorry, the factual basis goes through 2015. The indictment goes through 2012. So the financial analysis cuts off three years of potential losses. I don't know if that answers the question. And the question is, on page 98 you have a list. Yes, Your Honor. And does that list, is that up through 2015 or 2012? It's up through 2015. Well, now, what's the number for 2012? Is that shown on this list? No, it's not, Your Honor, but it does. After 2012, there's only about $223,000 of losses flowing out of the conspiracy. So your argument is that if this shows $7.2 million and there was only $200,000 after 2012, then this document shows it's still in the neighborhood of $7 million for the period up to 2012. Yes. I suppose this could have all been made a little clearer. We're spending a lot of time just talking. I thought all this arose from the question that if it was 3.5, even agreeing with the defendant here, what's the difference? And it seemed to me if that's the answer, you would have known that answer when you walked up here. That would be the first thing you see. It doesn't make a difference if you agree with her or not. It's still 3.5. That's true. Because that was there, and that's what I was expecting to come out. But I'm still confused in terms of I know the 80 pages dealing with analysis. Now you say 7.2 is stated somewhere, and now only $200,000 comes after 2012? Yes, Your Honor. So if we went down that list, those documents, it's what, 40 pages, 50 pages of documents there at 98. If we go down that list and stop at December 2012 and add up all those numbers, we get neighborhood of $7 million. Yes, but as I mentioned, some of those documents are omitted from the record, but there's no indication that those records were inadvertently omitted. I asked you a question about what it shows at 98. At record 98 up through 140, there's about 40 pages, 50 pages of entries, right? It's a chart. Yes. And that chart, is it listed chronologically by entries? Yes, it's listed. There's a generation one and generation two analysis for both the MoneyGram and the Western Union. Okay. So I cut off the chart in the JA here at December 2012 and add up the numbers, and you're saying those numbers shown here in the JA add up to around $7 million. And what I was trying to explain is that- Is the answer yes or no? Not as they currently exist in the record because the 80 pages were inadvertently omitted. 80 of these pages, these at 98? Yes. But there's no indication that this information was omitted before the district court. Probation relied upon the financial analysis. I don't understand all that. And it's in the probation. You mean the PSR has it in there? Yes. The PSR has $7.2 million. The defense counsel never contests that. You better supplement the JA then so that we cross our keys on this. I think this is a fairly significant slip-up in the preparation of the appendix. Yes, Your Honor. With respect to her two primary claims for the loss amount, there's no indication that the MoneyGram wire transfers were properly attributed to Ms. Shepard. She received, if you look at- She confessed to the MoneyGram. She confessed to it, and she, in fact, received at least eight MoneyGram wire transfers. And then, as you noted, there's no indication that she actually withdrew from the conspiracy. Mere cessation of activity is insufficient to establish withdrawal. Well, I thought you just said that doesn't make any difference. Even if she withdrew in December 2012, it's still way more than $3.5 million. Absolutely. All right. With respect to the vulnerable victim enhancement issue, Ms. Shepard knew that these victims were particularly susceptible to the telemarketing fraud scheme. Not only did she operate as an opener in which she convinced individuals to send money to obtain telemarketing prizes, she also worked as a loader, inducing individuals who had already fallen for the fraud scheme. As such, she was well aware that these individuals- We would argue yes. And, in fact, six other circuits- Because this is just such a scheme that makes you so gullible. It's an interesting situation. I think the question I want to ask is, why not have a particular individual or victim come forth and present evidence of vulnerability? I don't know why individuals did not choose to speak at sentencing. However, they submitted multiple victim impact statements. But, more importantly, if you look at the- They did, but the trial judge didn't make any findings on that. They didn't even use it in terms of enhancement. I can tell all they did was basically say, I guess, common sense. I agree. It looks that way to me. I would say the first time you did it, you're vulnerable, gullible. And the reloading probably adds to it. But the cases all seem to point to instances in which at least somebody has said, a specific individual, somebody is gullible, one person. There's no such thing here. Well, here, if you look at the spreadsheets that were submitted to the court at sentencing as Exhibit 1, you will show that even Ms. Shepard received money-grant wire transfers from the same individual multiple times. Some of these individuals sent wire transfers upwards of 20 times, others seven or eight times. So these individuals were clearly gullible. They kept falling for the scheme. Is being stupid the same thing as being gullible? Not to use that term pejoratively, but being just naive or, you know, we get this. I'm from a rural area, and I've often had the thought that those who came from rural areas, like myself, might be a little bit more gullible to some of the city ways. And I'm thinking someone sends someone in the days of lotteries where we've got all this money, $500 million in the lottery last week. Someone sends you something and says you won $5 million. Doesn't sound far-fetched as it used to be because nobody gave away $5 million in those old days. Now they give away $500 million. And the idea of sending money to it, it does seem like no reasonable person would do it in the first instance, much less reload it 20 times. So I don't know to what point they become gullible. Either they're gullible from the first instance or somewhere along the line, or you bring the individual in and says this is an elderly lady, this is a lady who's shown this, and, you know, you preyed upon this person who's gullible for this. I'm not saying it doesn't exist. I'm just going on what's here in the record, what's been shown. Well, I think, you know, this six other circuits, the second, the fifth, the sixth, the seventh, and the eleventh, or I'm sorry, the ninth and the eleventh, have all identified victims who have fallen for this rip-off scheme, not once but twice. And in none of those cases were there particular individuals who were put forth. Some of those cases, yes, there were victims. I don't recall all of them. Which of the cases in which there were absolutely no victims brought forth and the court simply just made a generalized finding that it was done over and over? Which case is that? I don't recall if any of the victims did testify. I know in one particular case. But I want to know which case are you saying the facts of this case is this. There's not a victim being brought forth. You just have the bare bones information of what I would agree, first time around, it looks like to me you're gullible, but I don't think that's what you go on, that you're doing it over and over and at some point in time you can say this person's gullible, so you get a two-point enhancement. Well, I think the Seventh Circuit in Jackson explains it well when they say, whether these persons are described as gullible, overly trusting, or not just naïve, their readiness to fall for the telemarketing ripoff, not once but twice, demonstrated that their personalities made them vulnerable in a way and to agree not to be gullible. And no victim was introduced in that case? I don't know, Your Honor. I don't recall from the facts. I think that's critical. Ms. Bowman, so what was the evidence of reloading? If there were no victims who testified, where did that evidence come from? So Ms. Shepard stated, well, in addition to pleading guilty to those facts, she stated that she and her co-conspirators would continue to call the victims as loaders. And in the written statement to the probation office, she said, my co-conspirators and I would reload the victim as long as the victim was willing and able to continue to transfer funds. So it doesn't sound to me like we need any victims to show up, but she admitted. Exactly, and she further states, many victims spent tens of thousands of dollars to my co-conspirators and I in response to those calls. And she, in fact, received at least. She's just saying it happened. She doesn't even know who the victim is. She's saying it's happening. We got folks doing it over and over again. That's no different than just saying a general statement it was reloaded. In Jackson, you had victims. In every one of those cases, you've had victims. I don't know of a case that there has not been a victim. It doesn't take much now. You can bring somebody out and at least look at someone and say, this person is gullible, other than the generalize. Because if you can do that in every case in which you have a repetitive situation where we can sort of look at it in the general knowledge and say it looks like you're gullible to me because you've done it over and over again and only someone gullible would do this. Unless we're willing to say that per se, doing it over makes you vulnerable. So, boom, we don't need to do any more findings. Well, the very fact that these individuals fell for this scheme, some of these individuals fell for this scheme multiple times and sent wires overseas. It looks bad, and I agree with you. It looks likely just as gullible as it could be, but I don't think that's what's, I think you've got to do a bit more to say they're vulnerable because it could be. Here's the other thing. It's just as likely you've got someone out there who actually just, they could be college graduates who are just savvy out there and decide, well, I'm okay. I'll send in a little money. It's just a little money. If I lose it, I'm good. You're talking $5 million. Why not? It didn't mean anything to them. These people could have been filthy rich. It just says, well, that's peanuts I'm sending. But it turns out they weren't. I understand that. But you ought to have someone come in and testify to that. It seems to me to get this enhancement. We respectfully disagree. We feel the fact that she made the statements to probation office, the fact that the wire transfers show that multiple victims sent, as I mentioned earlier, upwards of some of them sent upwards of $100,000. Others sent $70,000. They were contacted and sent wires, you know, upwards of 20 times, seven to eight times. So we believe that this is sufficient to show that the vulnerable enhancement. I'm not disagreeing that it's the most incredible thing I've heard. When I read it, it was just absolutely incredible that someone would send it one time for that amount of money. All right. Thank you. Thank you, Aaron. Ms. O'Connell. I'd like to let this court know that there are no records missing. I was trial counsel. I represented Ms. Shepard. The original pre-sentence report was 180 pages. When I filed objections, the probation office has supplemented it, and it was 540 pages. Let me ask you this. I'll try to go through this again. The government says that they showed a chart in 98 that totals $7.2 million up through 2015. Is that right? That's correct, Your Honor. Okay. Just stick with me. I've got a series of questions here. They say that after December of 2012, there was only an amount in the $200,000 range that is shown on that chart. Is that correct? That's incorrect, and I would disagree. I'll point the court to go to page 98. On that Generation 1 time period, you have, under Ms. Shepard, 105-2010-11-17-2011. The amount shown on Generation 1 for Western Union is $610,317.94. On that time period, Generation 1, Moneygrams, January 2010 to July 31, 2010, you have an amount shown of $320,000, $458.20 for a total of $976,014. On that time period, too, which encompasses through 2015, that's where you have $5.2 million plus. Under the time period of Moneygrams from January 3, 2010 to July 26, 2012, you have $1,118,001,018-422.73. Just the amounts for time period 1, January 2010 through July 2011, November 2011, and then time period, if you exclude the Western Union that goes up to 2015, just through the relevant time period, you have $1.94 million. The amount balloons to $5 million plus because it goes through 2015. As I was indicating to the court, if the court looks at the charts provided on pages 90. I understand, but you know, the period you're talking about, Generation 2, includes still from 2010. What I need to know is, well, the Mailgram is only, it ends in 2012. Right. So we don't include all the Mailgram, but Western Union, it goes through 2015. Correct. What I need to know is how much was shown through Western Union from 2012 to 2015. Your Honor, I don't know. We don't have it. Nothing is missing from the district court page 99. Just a minute. Okay. There's a listing here. You see the listing that follows these pages that follow 98? Yes, Your Honor. What are they? I looked through them, Your Honor. I asked you, what are they? They're Moneygrams on Western Union from 2010 to 2012. There's nothing in 2013. There's nothing in 2014. Okay. Now, don't those add up to $7.2 million? The $7.2 million, if I may explain, Your Honor, what the government added as sentencing, which is what appears from page 976 to JA1063, is actually for restitution. I don't care what it's for. I want to know what the loss is. And if these numbers are their restitution because they show losses. These people paid these amounts. But, Your Honor, you're asking us to prove that the amounts were paid prior to 2012. That's the government's burden. We objected to the loss amount from day one. That's why we didn't sign a plea agreement. The loss amount was objected to in the factual basis. I'm trying to figure out the calculation. We say it's below 3.5. The government hasn't proven that it's more than 3.5 based on their own evidence. I'm going to ask both counsel to submit within 10 days a short statement, a short memo, no more than five pages, showing the calculations of loss from the beginning of the conspiracy up through December 2012. And both of you ought to do that because I want to see your numbers and I want to see the government's numbers. Is that fair enough? That's fair enough. And you're able to do that, right? Based on what's in the record, not anything the government will bring. Correct. And I just wanted to add, exposing her exposure before December 12, 2012, is really an amendment to the indictment. That's not what she had notice of. That's not what she pled to. Before what? Any time after 2012, which is what the numbers on page 98 deal with. Before or after? Anything after 2012. No, I agree. I want to know the number up through 2012, what the record shows. Yes, sir. Because it's very hard for us as a court to go through and try to figure this out if it is here. But I want you both to see what the record shows for losses from the beginning of the conspiracy up until December 2012. Yes, sir. Is that clear? Yes, sir. Can you understand this moment? All right. Did you say within 10 days? 10 days. 10 days. Is that okay? Yes, Your Honor. Thank you. Is that okay with you guys? All right. Are we going to get a supplement from the government? Are we going to get a supplement from the government? She says there's no missing pages. Yes, Your Honor. If you look at the spreadsheet. Well, you can supplement the pages then, too. Make sure you provide her with a copy. It says it goes through 2, 20, 100, and then the next page goes to MoneyGram. So as I was preparing, this is how I discovered this. It apparently didn't hurt the mission because of the record. But you can only include what's in the record? Yes, Your Honor. Okay. Supplemental appendix, and then you each are going to give us a calculation. I just want to add there's nothing missing. The joint appendix was prepared for every filing that is in the district court file. Okay. Well, that's fair enough. I mean, if it's not in the record, she can't bring it up. It's got to be in the record. Otherwise, we can bring up the record and look at it ourselves, but I think that's why we have counsel. That's right. Thank you. All right. We're going to, after all this, we're going to look into this, and we're going to consider your arguments and adjourn. Signing die, and then we'll come down and greet counsel. Thank you. Oh, Ms. Okapuara, you were court appointed? I am, Your Honor. I want to acknowledge that. Thank you very much for the service to the court. As you know, it's very important to make our system a good system, and you've helped a lot. Thank you. Okay. This honorable court stands adjourned. Sign and die. God save the United States and this honorable court.
judges: Paul V. Niemeyer, James A Wynn Jr., Albert Diaz